**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

HIGH TECH NATIONAL, LLC, d/b/a
HIGH TECH LOCKSMITHS,

    Plaintiff,

vs.

STEELERS KEYS, LLC,

    Defendant.

Case No.

**COMPLAINT**

High Tech National, LLC, d/b/a High Tech Locksmiths ("HTL"), by and through its counsel, respectfully files its Complaint against Steelers Keys, LLC ("Steelers") for: (1) violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"); (2) violation of the Lanham Act, 15 U.S.C. § 1125, (3) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), (4) conversion, (5) violation of the Florida Unfair and Deceptive Business Practices Act, (6) violation of the Florida Uniform Trade Secrets Act, and (7) breach of contract. In support of its Complaint, HTL states as follows:

**INTRODUCTION**

1. HTL services most of the United States as the largest mobile automotive locksmith service of its kind in the world.

2. HTL is the leader in transponder, remote, high security, remotehead, smart key, and proximity key services nationwide, providing same day, on-site services.

3. HTL specializes in scenarios where there is no key/remote for a vehicle or duplicate keys/remotes are needed. HTL has the proper hardware and software to generate a working key on location.

4. Steelers is a competitor of HTL's, owned by former HTL employee Juan Moore.

5. On May 17, 2019, Moore provided HTL with a lease document dated March 22, 2019, and signed by Moore on behalf of Steelers and purportedly signed by former HTL President and Chief Executive Officer Jay Wiener on behalf of HTL for the lease of five (5) Mercedes-Benz vans (collectively, the "Vehicles" or separately, a "Vehicle") to Steelers. *See* Alleged Commercial Vehicle & Equipment Lease Agreement (the "Alleged Lease"), attached as **Exhibit A**. Those Vehicles were each equipped with HTL's proprietary equipment, computer systems, and inventory.

6. All five Vehicles are owned exclusively by HTL, as reflected in the titles for the vehicles and in the terms of the Alleged Lease. *See* Vehicle titles attached as **Exhibit B**; *see* Exh. A at ¶ 2.

7. The first payment under the Alleged Lease was not due until June 1, 2019. *See* Exh. A.

8. Wiener was no longer employed by HTL as of April 23, 2019, a little more than a month after the Alleged Lease was signed.

9. Wiener's decision to enter into the Alleged Lease was a violation of his fiduciary and contractual obligations to HTL and was part of an unlawful effort to compete with HTL. Thus, the Alleged Lease is not a valid lease.

10. Even if the Alleged Lease were valid, Steelers failed to abide by its terms and breached the Alleged Lease.

11. On May 21, 2019, HTL sent a letter to Moore, providing notice of termination of the Alleged Lease and making certain requests for information that Steelers is required to provide to HTL under the Alleged Lease. *See* **Exhibit C**.

12. Steelers has ignored this letter and, in at least one instance, stripped a Vehicle of tens of thousands of dollars' worth of HTL's proprietary equipment and inventory.

13. HTL now brings this action to hold Steelers responsible for its statutory and common law violations (or alternatively, its breach of the Alleged Lease), put an end to Steelers' unlawful trade practices, and recover HTL property.

## JURISDICTION AND VENUE

14. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the DTSA, Lanham Act, and CFAA counts present federal questions.

15. The Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same case or controversy.

16. HTL is an Indiana limited liability company. Its sole member is ADESA, Inc., which is a Delaware corporation headquartered in Indiana. HTL is therefore a citizen of Indiana and Delaware for diversity jurisdiction purposes.

17. Steelers is a Delaware limited liability company whose sole member is Juan Moore, a citizen of Texas. Steelers is therefore a citizen of Texas for diversity jurisdiction purposes.

18. This dispute involves greater than $75,000 in controversy and complete diversity, thus this Court also has diversity subject matter jurisdiction under 28 U.S.C. § 1332.

19. This Court has personal jurisdiction over Steelers because Steelers agreed to exclusive jurisdiction in the state of Florida and the county of Miami-Dade in the Alleged Lease. *See* Exh. A, ¶ 15.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District. Moreover, the Alleged Lease contains a forum selection clause designating this Court as a proper venue. *See* Exh. A, ¶ 15.

## FACTUAL BACKGROUND

### HTL's Vehicles, equipment, and leasing procedures

21. At issue in this case are five (5) Vehicles, each containing $30,000 to $75,000 worth of HTL inventory for making keys, transponders, remotes, smart keys, and proximity keys for vehicles on site, as well as proprietary equipment.

22. The equipment includes both hardware and software that allows HTL locksmith technicians to generate working keys.

23. This necessarily includes computers that were connected remotely to HTL's network.

24. Attached as **Exhibit D** is a photo of a fully equipped Mercedes-Benz vehicle, with all necessary equipment. All five Vehicles at issue in this case were similarly equipped.

25. HTL does not lease its vehicles, particularly fully equipped vehicles containing its inventory and proprietary equipment, to competitors for use by competitors such as Steelers because doing so would deprive HTL of the revenue that it is able to generate from the vehicles and allow the competitors to use HTL equipment for their own directly competitive businesses. There was no valid or justifiable reason for HTL to lease out its vehicles to Steelers.

26. The Alleged Lease calls for payments of $1,242 per month (or $14,904 annually) per Vehicle. *See* Exh. A.

27. But Moore has acknowledged that a single vehicle could generate as much as ***$400,000*** in revenue. *See infra* ¶ 47.

28. As president and CEO of HTL, Wiener had an obligation to protect HTL and its corporate assets. Wiener had no authority to knowingly divert corporate assets without approval from senior management at KAR Auction Services, Inc. ("KAR"), the affiliated company that ADESA, Inc. had placed in charge of overseeing HTL. Wiener never informed or sought the approval for leasing the Vehicles from senior management at KAR.

29. In fact, senior management at KAR was not aware of the Alleged Lease until Moore provided it to HTL on May 17, 2019.

30. Senior management at KAR would not have given Wiener authorization to sign the Alleged Lease with Steelers.

31. Accordingly, Wiener lacked actual authority to enter into the Alleged Lease and his doing so was a violation of his contractual and fiduciary obligations to HTL.

## The Alleged Lease

32. For the reasons set forth above, the Alleged Lease is not a valid and enforceable agreement.

33. However, the Alleged Lease states, in relevant part:

The Vehicles are and shall at all times remain the property of the Lessor.

Exh. A at ¶ 2.

34. The Alleged Lease further states:

Lessee shall not make any modifications, alterations or additions to the Vehicles without prior written consent of Lessor.

Exh. A at ¶ 4.

35. The Alleged Lease further states:

Lessor shall have the right, but not the obligation, upon reasonable prior notice to Lessee and during Lessee's regular business hours, to inspect the Vehicles at the premises of Lessee or wherever the Vehicles may be located. Upon the

> termination of the Lease the Vehicles shall be returned at Lessee's expenses to Lessor at such place as may be designated by Lessor for such disposition and the Vehicles in substantially the same state of repair, condition and working order as at the date of this Lease.

Exh. A at ¶ 6.

36. The Alleged Lease further requires Steelers to purchase and maintain multiple insurance policies, name HTL as an additional named insured on all such policies, and provide HTL with Certificates of Insurance. The Alleged Lease establishes that "failure of Lessee to secure or maintain such insurance shall cause this Lease to automatically terminate and Lessee shall immediately return the Vehicles." Exh. A at ¶ 10.

### HTL's attempts to recover the Vehicles

37. In mid-May 2019, HTL conducted an audit of trucks and inventory. During that audit, HTL identified unusual activity related to two Vehicles.

38. The two Vehicles were supposedly "grounded" (meaning not currently in service) and HTL's systems showed no orders had been fulfilled related to those Vehicles, but HTL determined that these Vehicles were still being used to do work.

39. HTL determined that these two Vehicles were in Louisiana and Michigan.

40. The Vehicle in Louisiana was being used at Americas Auto Auctions in Baton Rouge by former HTL employee Anthony Scott.

41. HTL Regional Manager John Bilodeau saw Scott working from the HTL Vehicle at that location and initially believed that he had been re-hired by HTL, but that was not the case.

42. Scott was employed by Steelers.

43. Scott was using the HTL Vehicle, equipment, and inventory, but invoicing to Steelers.

44. After Bilodeau discussed these issues with him, Scott resigned from Steelers on or around May 9, 2019.

45. On or about May 15, 2019, Scott relinquished control of the Vehicle, and HTL took it to an ADESA auction site in Shreveport. Although all equipment in the Vehicle was accounted for, inventory had been used to fulfill orders. HTL is continuing to assess the inventory in that Vehicle. Steelers used HTL inventory and equipment to fulfill and profit from Steelers' competitive work.

46. Inside the Vehicle, HTL found stacks of Steelers invoices and a Steelers laptop.

47. On May 17, 2019, HTL learned about the Alleged Lease when it was emailed by Moore to then-HTL Field Operations Manager Randy Fieler. The email is attached as **Exhibit E**.

48. Moore claimed that the Vehicle in Louisiana had been leased to him and the loss of the Vehicle would cause him to lose more than $400,000 in revenue at the site in Louisiana. *See* Exh. E.

49. Upon learning that Steelers was in possession of the four remaining Vehicles and using HTL equipment and inventory in those Vehicles to directly compete against HTL, HTL demanded immediate return of the Vehicles, but Steelers refused.

50. The Vehicle in Michigan had previously been driven by HTL's Central Regional Manager Donald Croley, before he moved into his current role in mid-March 2019.

51. Wiener, who was still president and CEO of HTL at the time, asked Croley who would be a good candidate to replace him in the Vehicle, and Croley suggested former HTL employee Greg Maldonado.

52. Wiener never re-hired Maldonado as an HTL employee, but at Wiener's direction, Maldonado began using the HTL Vehicle and the related equipment and inventory for the benefit of Steelers.

53. Croley learned through calls from clients that although Maldonado was using HTL equipment, he was invoicing from Steelers.

54. Croley saw the Vehicle in the driveway of Maldonado's home, parked alongside an unmarked Nissan van.

55. On the morning of May 18, 2019, Croley saw that both vehicles were gone from Maldonado's home and reached out to Maldonado via text message to find out what had happened to the HTL vehicle.

56. Maldonado called Croley around 10:00 a.m. on May 18, 2019, and said he was told that Wiener owned the HTL Vehicle.

57. Maldonado said he had been told to pull all of the equipment and inventory out of the HTL Vehicle and put it into the Nissan van, which was owned by Steelers.

58. Maldonado refused to tell Croley where the HTL Vehicle was but said it would be returned after it was stripped of equipment and inventory.

59. On May 20, 2019, around 8:00 a.m., Maldonado texted Croley, telling him that the Vehicle had been dropped off at an ADESA auction site.

60. Croley went to the auction site and found the Vehicle stripped of all the HTL equipment and inventory. Steelers or its agents had taken all of the HTL equipment and inventory from the Vehicle and never returned any of it to HTL. Attached as **Exhibit F** are photos of the Vehicle as it was found by Croley.

61. In addition to being an act of theft and conversion, this was a violation of the Alleged Lease because the removal of the equipment and inventory in the Vehicle constituted a "modification" to the Vehicle. *See* Exh. A at ¶ 4. Steelers had no valid written consent from HTL to modify the Vehicle in this fashion. To the extent Wiener provided any such written consent, it was not authorized or enforceable.

62. Steelers knew or should have known that as of the date Steelers modified the Vehicle, Wiener was not employed by HTL and thus any purported consent for such modifications was no longer in effect.

63. On May 21, 2019, HTL sent a termination notice letter related to the Alleged Lease. *See* Exh. C.

64. The May 21, 2019 letter provided the 60-day written notice described in the termination provision of the Alleged Lease. *See* Exh. A at p. 1; Exh. C.

65. But by failing to respond to the other requests made in the May 21, 2019 letter, Steelers triggered other termination provisions in the Alleged Lease.

66. The May 21, 2019 letter noted that any modifications of the Vehicles (including the removal of equipment) were a violation of the Alleged Lease and demanded that any such modifications be remedied within 10 days pursuant to Section 11(A)(1) of the Alleged Lease. *See* Exh. A at ¶ 11; Exh. C.

67. Additionally, the letter revoked any alleged written consent that may have been given by Wiener related to the modifications. *See* Exh. C. The letter also demanded the opportunity to inspect the Vehicles pursuant to Section 6 within 24 hours of receipt of the letter which was on May 21, 2019. *Id.*

68. Steelers never responded, nor did it remedy the modifications to the Vehicle HTL recovered in Michigan by May 31, 2019. Steelers also did not present the Vehicles for inspection.

69. The May 21, 2019 letter also asked Steelers to immediately provide the Certificates of Insurance and endorsements required by Section 10 of the Alleged Lease. *See* Exh. C.

70. Steelers has not provided that documentation.

71. On information and belief, Steelers has failed to secure or maintain the insurance required in Section 10.

72. On June 3, 2019, having received no response from Steelers regarding these lease provisions, HTL sent a second letter, terminating the Alleged Lease effective immediately. *See* **Exhibit G**.

73. Accordingly, the Alleged Lease has been terminated and Steelers no longer has any basis to be in possession of any HTL Vehicle, equipment, or inventory, even if the Alleged Lease were a valid agreement.

74. On May 23, 2019, HTL was able to recover two other Vehicles in California. An inventory of those Vehicles' equipment and inventory is ongoing.

75. On June 17, 2019, the fifth vehicle was recovered in Indiana.

**Steelers' unfair competitive behavior**

76. In contravention of the Alleged Lease and relevant statutory and common law requirements, Steelers has improperly appropriated, used, and withheld HTL's equipment and inventory.

77. Steelers has performed locksmith services using HTL's proprietary equipment and held itself out as being the owner of those systems.

78. For example, Scott performed locksmith services in an HTL truck, using HTL equipment, while working for Steelers.

79. Similarly, someone acting on behalf of Steelers told Maldonado that Wiener owned the Vehicle in Michigan and Maldonado was authorized to remove the equipment and inventory from that Vehicle.

80. On information and belief, Steelers has used the computers in the Vehicles to access HTL's internal computer system and view proprietary and confidential information.

## COUNT I – VIOLATION OF DTSA

81. HTL incorporates Paragraphs 1 through 80 by reference as if fully set forth herein.

82. The DTSA provides a private cause of action to any owner of a trade secret that is misappropriated if the trade secret is related to a service used in interstate commerce. *See* 18 U.S.C. § 1836(b)(1).

83. HTL's propriety hardware and software systems constitute trade secrets because HTL has taken reasonable measures to keep the design and underlying code of these systems secret, and this information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

84. By using the equipment in the Vehicles without consent, refusing to return the equipment, and removing the equipment from the Vehicles, Steelers acquired, used, and/or disclosed HTL's trade secrets.

85. Similarly, by accessing and using HTL's computer systems without permission, Steelers acquired, used, and/or disclosed HTL's trade secrets.

86. HTL has been damaged by Steelers' action in the form of lost economic value of the trade secrets.

WHEREFORE, HTL prays for preliminary and permanent injunctive relief barring Steelers from continuing to use HTL's trade secrets, compensatory damages, exemplary damages, attorneys' fees, costs, and prejudgment interest against Steelers for its violations of the DTSA, and for such other relief as the Court deems just and proper.

## COUNT II – VIOLATION OF LANHAM ACT – UNFAIR COMPETITION

87. HTL incorporates Paragraphs 1 through 80 by reference as if fully set forth herein.

88. The Lanham Act provides a private cause of action to any entity that is damaged by a false or misleading representation of fact that is likely to cause confusion as to the origin of a service. *See* 15 U.S.C. § 1125(a)(1)(A).

89. Steelers has falsely stated, or at least implied, in the marketplace that the technology it is using to provide locksmith services belongs to Steelers when in fact it belongs to HTL.

90. By making these misrepresentations, Steelers caused confusion as to the origins of its services, systems, and tools. As an example, one of HTL's own employees, Bilodeau, was originally confused about what company a technician worked for when he was using HTL's Vehicle.

91. HTL has been damaged by Steelers' action in the form of lost business, in an amount to be proven at trial.

WHEREFORE, HTL prays for preliminary and permanent injunctive relief barring Steelers from continuing to make false representations in the marketplace, compensatory damages, treble damages, attorneys' fees, costs, and prejudgment interest against Steelers for its violations of the Lanham Act, and for such other relief as the Court deems just and proper.

**COUNT III – VIOLATION OF SECTION 1030(A)(2)(C) OF CFAA**

92. HTL incorporates Paragraphs 1 through 80 by reference as if fully set forth herein.

93. The CFAA provides a private cause of action against anyone who intentionally accessed a computer without authorization or exceeded his authorized access to obtain information from a protected computer. *See* 18 U.S.C. § 1030(a)(2)(C).

94. The CFAA defines a "protected computer" as a computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(b).

95. The CFAA allows for a private cause of action if there is a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i).

96. HTL's computers are used in and affect interstate commerce by operating locksmith services to consumers and companies in multiple states.

97. In accessing trade secrets, proprietary material, and other confidential information for the benefit of Steelers while purportedly leasing the Vehicles from HTL, Steelers' locksmith technicians exceeded their authorized access to the computers in the Vehicles.

98. HTL has suffered — and continues to suffer — losses in excess of $5,000.00 in a one-year period, including, without limitation, the costs of investigating this incident after learning of the various breaches by Steelers, including internal time spent on investigating this

episode, and the costs of engaging a law firm and a computer forensics investigator to lead the investigating of Steelers' misdeeds.

99. As a result of Steelers' wrongdoings, HTL has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable injury, for which there is no adequate remedy at law to compensate.

WHEREFORE, HTL prays for preliminary and permanent injunctive relief barring Steelers from continuing to use HTL's trade secrets, proprietary material, and other confidential information, compensatory damages, costs, and prejudgment interest against Steelers for its unauthorized access to HTL's computer systems, and for such other relief as the Court deems just and proper.

## COUNT IV – CONVERSION

100. HTL incorporates Paragraphs 1 through 80 by reference as if fully set forth herein.

101. By possessing and using the five recovered Vehicles and the related equipment and inventory, Steelers wrongfully deprived HTL, as the rightful owner of the Vehicles and property, of possession and use of its property.

102. HTL has the exclusive right to possession and use of the Vehicles, the equipment, and the inventory.

103. HTL does not concede that the Alleged Lease was valid, but even if it were, it has now been terminated because of Steelers' multiple breaches and HTL has a right to possession of all Vehicles, equipment, and inventory.

104. HTL has made multiple demands for the return of its property, but those demands have been rejected or ignored.

WHEREFORE, HTL prays for an order requiring Steelers to return any missing equipment or inventory, compensatory damages, costs, and prejudgment interest against Steelers for its conversion of HTL's property, and for such other relief as the Court deems just and proper.

## COUNT V – FLORIDA UNFAIR AND DECEPTIVE BUSINESS PRACTICES ACT

105.  HTL incorporates Paragraphs 1 through 80 by reference as if fully set forth herein.

106.  Steelers used unfair methods of competition, unconscionable acts or practices and unfair or deceptive practices in the conduct of trade or commerce within the meaning of Fla. Stat. § 501.204.

107.  Steelers acquired trade secrets, proprietary material, and other confidential information belonging to HTL and utilized and continues to utilize this information for Steelers' own benefit and to the detriment of HTL.

108.  As a result of the foregoing, HTL has suffered damages in an amount to be proven at trial.

109.  Pursuant to Fla. Stat. § 501.2105, HTL is entitled to recover its attorneys' fees from Steelers.

WHEREFORE, HTL prays for compensatory damages, attorneys' fees, costs, and prejudgment interest against Steelers for its unfair trade practices, and for such other relief as the Court deems just and proper.

## COUNT VI – UNIFORM TRADE SECRETS ACT

110.  HTL incorporates Paragraphs 1 through 80 by reference as if fully set forth herein.

111.  Steelers used confidential and proprietary information about HTL's systems and equipment to compete with HTL without the express or implied consent of HTL.

112. The information at issue constitutes trade secrets because it is information that derives independent economic value from not being generally known, or not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use.

113. HTL made reasonable efforts to maintain the secrecy of their trade secrets.

114. As a direct and proximate cause of Steelers' misappropriation of HTL's trade secrets, HTL has been damaged, Steelers has been unjustly enriched, and HTL is entitled to a reasonable royalty for the misappropriation.

115. Pursuant to Fla. Stat. § 688.005, HTL is entitled to recover its attorneys' fees from Steelers.

WHEREFORE, HTL prays for preliminary and permanent injunctive relief, compensatory damages comprising actual damages and unjust enrichment of Steelers, attorneys' fees, costs, and prejudgment interest against Steelers for its misappropriation of trade secrets, and for such other relief as the Court deems just and proper.

## COUNT VII – BREACH OF CONTRACT
**(In the Alternative)**

116. HTL incorporates Paragraphs 1 through 80 by reference as if fully set forth herein.

117. For the reasons set forth above, the Court should find that the Alleged Lease is not a valid and enforceable contract.

118. However, if the Court finds that the Alleged Lease is a valid contract, HTL is entitled to relief because Steelers has breached the terms of the Alleged Lease.

119. Steelers has substantially modified one of the Vehicles by removing equipment and inventory, in violation of Section 4 of the Alleged Lease.

120. Steelers has refused to restore the Vehicle to its original condition — accordingly, Steelers is in default under Section 11(A)(1) of the Alleged Lease.

121. Steelers has not responded to HTL's demand to pursuant to Section 6 of the Alleged Lease to inspect the Vehicles.

122. Steelers has refused to provide HTL with evidence of insurance pursuant to Section 10 of the Alleged Lease and on information and belief, Steelers has failed to obtain and maintain the required insurance.

123. As a result of Steelers' breaches, HTL has suffered damages in an amount to be proven at trial.

WHEREFORE, HTL prays for preliminary and permanent injunctive relief barring Steelers from continuing to use HTL's trade secrets, proprietary material, and other confidential information, an order requiring Steelers to return missing equipment and inventory, compensatory damages, attorneys' fees, costs, and prejudgment interest against Steelers for its breach of the Alleged Lease, and for such other relief as the Court deems just and proper.

Dated:   June 20, 2019              By: */s/ Dana J. McElroy*

                                                Dana J. McElroy
                                              dmcelroy@tlolawfirm.com
                                              THOMAS & LOCICERO PL
                                              915 Middle River Drive, Suite 309
                                              Ft. Lauderdale, Florida 33304
                                              Tel: 954.703.3416
                                              Fax: 954.400.5415

Blaine C. Kimrey (*pro hac vice* application forthcoming)
bkimrey@vedderprice.com
Bryan K. Clark (*pro hac vice* application forthcoming)
bclark@vedderprice.com
VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, Illinois 60601
Tel: 312.609.7810
Fax: 312.609.5005